[742 NYS2d 626]

In the Matter of ERNEST VALLEBUONA et al., Petitioners, v BERNARD B. KERIK, as Police Commissioner of the City of New York, et al., Respondents.

First Department, June 4, 2002

## APPEARANCES OF COUNSEL

*Howard B. Sterinbach* of counsel (*Worth, Longworth, Bamundo & London, LLP,* attorneys), for petitioners.

*Julie Steiner* of counsel (*Barry P. Schwartz* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for respondents.

## OPINION OF THE COURT

NARDELLI, J.P.

In this CPLR article 78 proceeding, we are asked to determine whether substantial evidence supports the finding of an Administrative Law Judge (ALJ) that petitioners used excessive force in effecting an arrest after observing an apparent robbery in progress.

On January 26, 1996, at approximately 1:00 A.M., petitioners New York City Police Officers Ernest Vallebuona and Bernard Kelly were operating out of the Staten Island Auto Larceny Unit and were on patrol in an unmarked radio motor patrol in the vicinity of Castleton Avenue and Clove Road. The officers observed what appeared to be a robbery in progress and as they approached the scene, the three alleged robbers fled. The officers, after short chases, apprehended two of the suspects and one of them, Asim Martinez, claimed that excessive force was used by the officers during and after his arrest. Martinez's mother subsequently filed a complaint with the Civilian Complaint Review Board (the CCRB) asserting that, during her then 17-year-old son's apprehension and ride to the police station, he was hit several times with a flashlight by both officers.

Martinez, during an interview conducted by the CCRB, claimed that he and two friends were returning home from a club when they encountered another group of boys and that both groups removed their coats in anticipation of a fight, but the participants ran upon observing an unmarked police car approaching. Martinez alleged that he was caught by one of the officers in a backyard, and was immediately hit in the head with a flashlight, pushed to the ground, handcuffed, and placed in the backseat of the police car, where the "arresting officer" repeatedly hit him in the ribs, stomach and legs with a flashlight. The second officer, who apprehended Martinez's friend Paris McGruder, was seated in the driver's seat and is purported to have turned around and hit Martinez in the knee approximately five times and then, at the next red light, to have turned around and hit him and McGruder four more times.

Martinez also indicated that while in the police car, a radio run directed the officers to return to the scene of the incident, at which time the officers found a gun. Martinez contended that he and McGruder were then driven to a grocery store, where the other group of boys identified them as the individuals who tried to steal their coats, and then to the hospital, where Martinez received seven stitches to his forehead and two to the side of the head.

Officer Vallebuona, during his interview with the CCRB, stated that on the night in question, he and Officer Kelly observed a robbery in progress and that three black males were standing behind two white males, who had their hands up against a wall, and that one of the black males was pointing a gun at them. As Vallebuona and Kelly approached the scene, the three black males fled and Vallebuona began chasing Martinez on foot, with a flashlight in one hand and his gun in the other. Vallebuona observed Martinez throw a gun into the bushes and then crouch behind a bush in the driveway of a private home. Vallebuona returned his gun to its holster and then, according to Vallebuona, Martinez "sprang forward" and, in defense, he struck him with the flashlight and as they struggled, he brought Martinez face first to the concrete ground and handcuffed him. Vallebuona observed blood on Martinez's forehead.

Martinez and McGruder, the latter of whom was apprehended by Kelly, were placed into the backseat of the police car, at which time Vallebuona claims he recovered the gun Martinez threw into the bushes, which turned out to be a pellet gun shaped like a real automatic weapon. Vallebuona also recovered a ski mask and two jackets and, after the two suspects were positively identified, they were transported to the hospital. Vallebuona insisted that Martinez was injured during their initial struggle or when they fell to the ground and that he was never hit once he was apprehended. Vallebuona and his partner received medals for their police work during this incident and were awarded "Cop of the Month" by the Staten Island Advance.

Officer Kelly explained to the CCRB that he caught McGruder and placed him into the back of the patrol car, but did not observe Vallebuona's apprehension of Martinez. Kelly did note a "small cut" on Martinez's forehead and corroborated Vallebuona's account that he recovered a gun and that a ski mask was found on Martinez. Kelly denied hitting Martinez at any time.

The CCRB recommended charges be filed against both officers, and the New York City Police Department (the Police Department) thereafter filed charges and specifications against the petitioners alleging that they "wrongfully and without just cause" used excessive force upon an individual.

The Police Department Advocate's Office (the Advocate's Office) thereafter interviewed Martinez, who was described as "very hesitant to cooperate," and who stated that he did not possess a gun or ski mask on the night in question and that he did not steal any coats, although two coats were vouchered by the police. Martinez also contradicted his earlier statements, claiming that one officer struck him with a flashlight, while the other officer used a walkie-talkie, in contrast to his earlier statement that the officers took turns with a flashlight; and that he was hit more than 20 times by the driver of the police car, whereas during the CCRB interview, he alleged that he was struck less than 10 times by the driver. Officers Vallebuona and Kelly, when interviewed by the Advocate's Office, recounted the events consistent with their CCRB interviews.

In a memorandum dated September 14, 1999 from Assistant Advocate Lauren Fox to Lieutenant Herbert G. Woods, the CCRB Team Supervisor, Ms. Fox recommended that the charges against the officers be dropped based upon "the numerous inconsistencies and outright lies of the complainant that are contradicted by documentary evidence," including medical records which are consistent with petitioners' version of the events. Lieutenant Woods endorsed Ms. Fox's recommendation, but the Assistant Commissioner of the Advocate's Office, Kevin Lubin, did not sign off on the recommendation to dismiss the charges and, as a result, an administrative hearing was held before Administrative Law Judge Dierdra Tompkins on January 21, 2000.

Asim Martinez testified that he was currently living in a "residential rehab" as the result of a 1999 plea of guilty to possession of four bags of crack cocaine and that he had also been convicted of criminal possession of a weapon, a .22 caliber pistol, for which he was still on probation. Martinez claimed that on the night in question, he and two friends "ran into a couple of kids" and a confrontation arose over cigarettes. As members of the groups started taking off their jackets in anticipation of a fight, an unmarked car approached and "everybody scattered," with Martinez running into a backyard and hiding behind a garbage can.

Martinez alleged that an officer, who he later identified as Kelly, shined a flashlight in his face and told him to get on the

ground and "as he came up to me I had my hands in the air and he hit me with the flashlight in my forehead causing a gash in my forehead." Martinez contended that he was handcuffed, placed in the back of the police car and repeatedly hit with the flashlight by Kelly while being questioned. Martinez testified that the officers then drove them away, but received a radio run to return to the scene because another suspect had been apprehended, whom Martinez identified as his friend McGruder. Martinez stated that Kelly placed McGruder in the backseat and sat with them and that the officers "kept hitting both of us with the flashlight on the side of my face, on my knee * * * on my legs and in my ribs asking me where is the third person at."

Martinez alleged that Vallebuona, who was driving, turned, after stopping at a red light, and hit both suspects with his flashlight, and one of the blows caused a cut on his temple. The officers then received another radio run to return to the scene, where an investigating officer had found the pellet gun, after which they took Martinez to the hospital, where he received five or seven stitches in his forehead and two for a cut on the side of his face near his left eye.

The hospital records admitted into evidence indicate that the cuts to Martinez's forehead and left temple were 2.2 centimeters and 0.5 centimeters, respectively, and that Martinez explained to hospital personnel that the cuts had been "sustained during an altercation"[1] and that "[i]t's nothing." Moreover, the hospital records, as well as the subsequent records of Martinez's own health provider, are devoid of any indication that Martinez was repeatedly stuck with a flashlight or subjected to the severe beating he described he received at the hands of the petitioners.

Kelly testified that as they drove up to the scene, the three male blacks took off and the youths who remained claimed that they had just been robbed of their jackets. The officers had noticed what appeared to be a firearm, and Vallebuona went after one suspect while he went after the suspect he identified as McGruder. Kelly maintained that when he returned to the police car with McGruder, Vallebuona was already there with Martinez in handcuffs, and that it was Martinez who appeared to be holding the gun during the robbery.

Kelly testified that the complaining witnesses at the scene identified McGruder and Martinez as two of the men that

---

1. This statement is particularly relevant as it supports petitioners' version of the incident, and, specifically, how Martinez was injured.

robbed them and that at no time did either officer strike the suspects while they were in the car. Kelly averred that he did not notice either cut to Martinez's head, but that Vallebuona told him "one of the guys was bleeding" and that they had to go to the hospital. Kelly was unaware why Martinez testified that he, and not Vallebuona, was the officer that apprehended him.

Vallebuona testified that he saw a gun in Martinez's hand when he and Kelly first spotted the robbery, that he saw Martinez "throw the gun into the bushes" while he was in pursuit and that he observed him carrying a jacket which apparently was stolen. Vallebuona maintained that he saw Martinez crouched down in the backyard of a private home and that as he "came up on [Martinez] * * * he sprung up * * * we just started wrestling and he didn't want to be cuffed. We were rolling around on the ground." Vallebuona further testified on cross-examination that "[w]e were wrestling on the ground and we were also standing up, and we were on the ground again, we were standing up, it went back and forth," that "it was a very hard surface on the ground," and that there was a good chance that this was how Martinez was injured. When questioned, Vallebuona could not specifically recall if he struck Martinez with the flashlight during the struggle, stating "I didn't think so, but it's possible, who knows."

Vallebuona maintained that after Martinez was handcuffed, he was not struck again and that the alleged beating in the patrol car simply did not happen. Vallebuona later testified that the criminal case against Martinez and McGruder had been dismissed because he believed the complainants were intimidated by the suspects, as they attended the same school. An order of protection was issued to the complainants regarding Martinez.

ALJ Tompkins, by report and recommendation dated February 23, 2000 (the Report), found that petitioners' "use of force against Mr. Martinez was gratuitous, and in one instance, administered while the youth was handcuffed in the back seat of the patrol car." The ALJ, after reviewing the petitioners' personnel histories,[2] recommended that Vallebuona be suspended without pay for 10 days and that Kelly be suspended

---

2. The ALJ noted that Vallebuona, on July 11, 1997, "is alleged to have used excessive force. This complaint is still outstanding." Unfortunately, the charges the ALJ was referring to were the charges for this case so she either did not realize she was discussing the same case or decided to take the novel position that the charges in the instant case should be used to also justify

without pay for five days. On July 21, 2000, then Police Commissioner Howard Safir approved the ALJ's findings of guilt, but concluded that the recommended penalties were "too harsh in light of the officers' commendable employment histories, and the nature of the events which led up to this complaint, i.e., robbery committed by the complainant." The Commissioner then reduced the penalties to the forfeiture of 10 vacation days for Vallebuona and five vacation days for Kelly. Petitioners thereafter commenced this article 78 proceeding, which was transferred to this Court by an order of the Supreme Court, New York County, in which they seek to annul the Commissioner's determination on the ground that it was not supported by substantial evidence. We agree and grant the petition.

It is well established that judicial review of an administrative determination is limited to consideration of whether or not that determination is supported by substantial evidence (*Matter of Pell v Board of Educ.*, 34 NY2d 222, 230-231; *Matter of Acosta v Wollett*, 55 NY2d 761, 763; *Matter of Buric v Safir*, 285 AD2d 255, 263). Substantial evidence "does not rise from bare surmise, conjecture, speculation or rumor" (*300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d 176, 180; *see also, Matter of State Div. of Human Rights v RHS Mgt. Corp.*, 270 AD2d 426, 427), but, in the final analysis, "consists *of proof within the whole record* of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably—probatively and logically" (*300 Gramatan Ave. Assoc. v State Div. of Human Rights, supra* at 181 [emphasis added]; *see also, Matter of Hofsiss v Board of Educ.*, 287 AD2d 566, 568).

In this matter, a review of ALJ Tompkins' Report reveals that her conclusions are simply not supported by substantial evidence. Indeed, ALJ Tompkins, after summarizing the testimony of the parties, as well as the documentary evidence, begins her analysis with the rather remarkable conclusion that "[i]f I were to base this case on Mr. Martinez's testimony alone, I would be forced to dismiss the charges given Mr. Martinez's lack of candor about what he was doing on the night in question, including whether he had a pellet gun." Specifically, ALJ Tompkins found that Martinez was armed and robbing the

---

the penalty. Likewise, with regard to Kelly, the ALJ noted that he received a medal for excellent police duty "from an incident that occurred on January 26, 1996," which, of course, was the incident which gave rise to this proceeding.

victims on the night in question, and that Martinez was incorrect as to which officer found and apprehended him and administered what part of the varying accounts of the alleged beating. In order to rationalize, justify, or otherwise explain Martinez's obvious willingness to fabricate various aspects of his testimony, ALJ Tompkins, with absolutely no support in the record and, apparently, relying on her own version of human nature, made the baffling conjecture that "[a]lthough it appears that Mr. Martinez had no reason to lie about something that occurred four years ago and for which he suffered no conviction, he had some motive to keep his mother in the dark about this incident because he probably lied to her at the time about what he was doing that evening."[3]

The ALJ continued that "beyond my credibility assessments, independent evidence substantiates Mr. Martinez's version of how he received his injuries." The sum total of the "independent evidence" upon which the ALJ relies, however, is the single word "deep" used in the medical records to describe the cuts to Mr. Martinez's head. ALJ Tompkins thereafter extrapolated that the fact the cuts were "deep" "suggest[ed] that they were inconsistent with a fall, yet consistent with blows with a flashlight." Not only is this interpretation totally unsupported by medical testimony or anything else in the record, but it is just as consistent with Officer Vallebuona's allegations of a violent struggle on a hard surface. Moreover, and most convincing, is Martinez's *own statement* to medical personnel, on the same report describing the cuts as "deep," and upon which ALJ Tompkins relies, that he suffered the injuries during "an altercation," clearly supporting Vallebuona's version of events. ALJ Tompkins also ignores the fact that Martinez claimed no other injuries to hospital personnel on the night in question, or to his own health care provider on subsequent visits, despite the alarming number of purported blows he received from police officers wielding flashlights.

Since the "substantial evidence" relied upon by ALJ Tompkins is clearly insufficient, which, "in the eyes of the law [is] no evidence" (*300 Gramatan Ave. Assoc. v State Div. of Human Rights, supra* at 181; *see also, Matter of Scully v Safir*, 282 AD2d 305), we grant the petition and annul the Police Commissioner's determination.

---

**3.** While ALJ Tompkins goes to great lengths to conclude that Martinez lied so as not to upset his mother, she also takes the time in her Report to make an unnecessary, derogatory comment regarding the petitioners' "portly physiques."

Accordingly, in this proceeding brought pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, New York County [Marcy Friedman, J.], entered on or about January 25, 2001), the determination of the New York City Police Commissioner, dated July 21, 2000, which found petitioners guilty of using excessive force against an individual, and required petitioner Vallebuona to forfeit 10 vacation days, and petitioner Kelly to forfeit five vacation days, should be annulled, on the law, without costs, and the petition granted.

MAZZARELLI, SAXE, SULLIVAN and ELLERIN, JJ., concur.

In this proceeding brought pursuant to article 78 of the Civil Practice Law and Rules (transferred to this Court by order of the Supreme Court, New York County [Marcy Friedman, J.], entered on or about January 25, 2001), the determination of the New York City Police Commissioner, dated July 21, 2000, which found petitioners guilty of using excessive force against an individual, and required petitioners to forfeit vacation days, is annulled, on the law, without costs, and the petition granted.